IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

THE CRISPIN COMPANY, et al.,    )
                                )
                Plaintiffs,     )
                                )
        v.                      )        No. CIV-05-159-C
                                )
PETROTUB-S.A., et al.,          )
                                )
                Defendants.     )

MEMORANDUM OPINION & ORDER

The Crispin Company (Crispin) has moved for summary judgment on its indemnity and
breach of contract claims against Petrotub-S.A. (Petrotub).  Petrotub responded, and Crispin
filed a reply.  For the reasons stated below, summary judgment is granted in part and denied
in part.

STANDARD OF REVIEW

Summary judgment is proper only if the moving party shows "there is no genuine issue
as to any material fact and that the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  "An issue of fact is 'material' if under the substantive law it is essential
to the proper disposition of the claim."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670
(10th Cir. 1998).  "An issue is 'genuine' if there is sufficient evidence on each side so that a
rational trier of fact could resolve the issue either way."  Id.  At the summary judgment stage,
the Court's function is not to weigh the evidence but to determine whether there is a genuine
issue for trial.  Willis v. Midland Risk Ins. Co., 42 F.3d 607, 611 (10th Cir. 1994).  Thus, the
Court views the evidence in the light most favorable to the nonmoving party and draws all

reasonable inferences in that party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Simms v. Oklahoma ex rel. Dep't of Mental Health, 165 F.3d 1321, 1326 (10th Cir. 1999); McWilliams v. Jefferson County, ___ F.3d. ___, 2006 WL 2556350, at *2 (10th Cir. Sept. 6, 2006) ("In determining whether any genuine issue as to any material fact exists, evidence is to be liberally construed in favor of the party opposing the motion for summary judgment.").

## BACKGROUND

Petrotub manufactures "seamless, steel oil well casing" in Romania.  The casing is produced in joints, which are threaded at both ends.  The "field" end of a joint is fitted with a coupling manufactured by Petrotub in the same steel quality as the casing.  The "pin" end of the joint is threaded but does not have a coupling so that it can be connected to the field end of another joint.

Crispin, a Houston-based trading company that provides steel products to the oil, gas, and construction industries, and Petrotub entered into six purchase contracts between November 16, 2000, and February 6, 2001.  Pursuant to those contracts, Crispin purchased different types of casing for a total of $1,685,178.68.  (Pl.'s Mot. Ex. 3.).  Nicolae (Toni/Tony) Soto acted as a commissioned agent and Crispin's representative in Romania and assisted Crispin's procurement of Petrotub casing.  The casing joints purchased were of different strengths and hardness, diameters and number of pounds per foot.  In its "Specification for Casing and Tubing 5CT," the American Petroleum Institute (API) has developed designations

2

that describe the strength and hardness properties of finished casing.[1]  At issue in this case is the purchased P110 casings, which included joints with an outside diameter of 5 1/2 inches in both 17 and 20 pounds per foot and those with an outside diameter of 7 inches and designated as 29 pounds per foot.  The purchase contracts specified that the casing being purchased would "meet the requirements of API specification 5CT."  (Pl.'s Mot. Ex. 1, Crispin Aff. ¶ 6.)  Petrotub provided Mill Test Reports certifying that the P110 casings and couplings met API specification.  (Pl.'s Reply Ex. 5.)

Between December 1, 2000, and August 21, 2002, Crispin sold three of the four types of casing that it purchased from Petrotub, including P110, to Hager Brothers Pipe, Inc. (Hager Brothers).  Crispin did not change, alter, or modify any of the casing, including couplings, purchased from Petrotub.  (Crispin Aff. ¶ 8.)

From January 7 to April 30, 2002, Hager Brothers resold Petrotub casing (5 1/2" P110 17 pounds per foot and 20 pounds per foot) that it purchased from Crispin to Pride Energy Company (Pride) for use in its Gowdy well.  On September 12, 2002, Hager Brothers resold Petrotub casing (5 1/2" P110 17 pounds per foot) to Ward Petroleum Corporation (Ward) for use in its Chick Davis well.

Pride and Ward lined the respective well bores with 5 1/2" P110 casing and then performed "frac jobs."  A frac job "involves pumping high pressure fluid into a well in an attempt to fracture the geologic formation surrounding the well bore in hopes of stimulating

---

[1] K55, N80, L80, and P110 are API designations.  Crispin purchased casing from Petrotub at each of these designations.

production of oil or gas." (Pl.'s Mot. at 2.) During these frac jobs, the P110 casing failed. Specifically, at both wells, "the pin end of at least one 5 1/2" P110 joint separated from the field end of another joint where they were joined together with a 5 1/2" P110 coupling." (Pl.'s Mot. ¶¶ 8 & 9.) Subsequent testing showed that certain of 5 1/2" P110 couplings manufactured by Petrotub and used in the Gowdy and Chick Davis wells did not meet API standards for P110 casing. Petrotub argues that experts hired by it and Crispin in defense of the later lawsuits by Pride and Ward concluded that the proximate cause of the casing failure was excessive over-threading of the casing pins, or casing pins and couplings, due to the casing crew's failure to follow API Recommended Practice and Standards. (Def.'s Resp. at 5 ¶¶ 8-9.)

Pride performed the failed frac job on its Gowdy well on April 11, 2002. Ward performed the failed frac job on its Chick Davis well on October 4, 2002. Demand letters were sent to Crispin, the first of which was received on September 9, 2002. In October 2002, Petrotub sent a delegation of employees to Oklahoma to investigate the claims. Crispin hired a consultant (Coy Reece) to escort and assist the delegation.

In 2003, both Pride and Ward had filed separate lawsuits against Crispin and Hager Brothers based on the failed casing not meeting API specifications for P110 casing. Ward asserted claims for products liability, breach of warranty, fraud, and negligence. Pride asserted products liability and breach of warranty claims. Petrotub was brought into those suits as a third-party defendant based on Crispin's claims for indemnification and breach of contract. The cases were then removed to this Court.

Thereafter, Crispin and Petrotub entered into a joint defense agreement.   They maintained, as against Pride and Ward, that neither was aware of problems with the casing or couplings or at Petrotub's mill.  (Pl.'s Reply at 2 ¶ 1.)  Crispin and Petrotub also asserted that the casing failure was due to over-threading rather than a product defect.  Both the *Ward* and *Pride* cases settled, without any determination or admission of liability.[2]  Petrotub paid each settlement in its entirety.

In addition to participating in the defense of the *Ward* and *Pride* suits (as well as Petrotub's pre-suit investigation of those claims), Crispin felt compelled (based on customer reaction and its own concerns about liability) to have the Petrotub casing in its and Hager Brothers' inventory tested to ensure that it met API standards.  Of the unspecified number of joints and couplings tested, 31 joints and 11 couplings were found not to meet API specifications, could not be repaired, and were sold as salvage.  Even after testing, Crispin claims that it was forced to sell its remaining non-defective Petrotub casing at a loss.  Crispin also advanced Hager Brothers, in the form of new casing, what it was owed by Ward, who refused to pay its Hager Brothers invoice.

In this suit, Petrotub resists summary judgment by arguing that Crispin had knowledge that Petrotub's casing did not comply with the designated API specifications before it sold any such casing to Hager Brothers.  In support, Petrotub relies on the following October 29, 2001, e-mail from André Crispin, founder and CEO of Crispin, to Nicolae Soto:

---

[2]  The *Ward* suit settled in August 2004, and the *Pride* suit settled in June 2005.

Dear Toni,

WE are getting more claims - namely among others NO Drift Casing.

We have unimpeachable inside Petrotub information showing among other things, that some of the material produced by Petrotub is declassified officially for defects that do not necessarily exist and then shipped to other customers (special friends of management perhaps).

Also that few of the mill's Quality Assurance inspection (NDT Drift - final inspection is not documented by the mill.

Storage of unfinished and finished pipe is often mixed with rejected material and dangerously subject to mixing (i.e. TFE claim perhaps)

I don't know how we can protect ourselves from this dangerous practice.

One thing we must request at once is that all inspection steps by the mill's Q.A. Service must be documented in English and in writing before we pay the invoices.

Perhaps you have other ideas, but this situation is highly suspect and dangerous.

I will show you personally, the information I received when you come to Houston.

LAK, André

(Def.'s Ex. 9.)[3]

Soto apparently responded the next day with the following e-mail:

Dear Andre,

I read your email about the suspicion that Petro management may sell good pipes as rejects.

---

[3]  The text of this and other e-mails is reproduced exactly as it appears in the record without any attempt to indicate errors or omissions or to otherwise clarify what was written.

Personally, I doubt this info very much.  There are too many people involved in the process and it is impossible to bribe all of them to say that pipes are rejects when they are OK.

Regarding the Drift test, I know it being done on every pipe full lenghts...at least every time I checked it it was done properly.  Of course, there may be a small amount of pipes tested maybe "half way" or with the wrong tools, but they are accidents.

I do not see how can we have all the paperwork done as per QA or ISO 9002, which is thousands of pages, translated in english and what would be the use of it.
We can ask the mill to certify on the Quality certificates performing specific tests and conformity.

In any case I would like to see the information you have, before further comments.

At this moment, both Mr Barsan and Bulai are in Iran where mobile telephones do not work, so my first contact with them will be Friday evening.

Meanwhile, if there are new claims, please send me all documentation, to file them with the mill.

LAK, Tony

(Pl.'s Reply Ex. 5.)

Another e-mail from André Crispin to Soto, dated November 1, 2001, and in apparent reference to Petrotub, reiterated the "need to talk about the frightening report about the mill inspection practices I received on a very confidential basis."  (Def.'s Ex. 10.)

## DISCUSSION

Crispin contends that it is entitled to summary judgment on its claims for indemnification and breach of contract.  These claims and the parties' related arguments are considered more fully below.

A.      Indemnification

Crispin argues that it is entitled to indemnification from Petrotub, at common law and by statute, for "the entire loss" it suffered as a result of distributing defective casing, including its attorney fees and costs incurred in the *Pride* and *Ward* suits and in this action.[4]   In response, Petrotub contends that the statute relied on did not become effective until November 1, 2004, and should not be given retroactive effect; its casing was not the proximate cause of the injuries involved in the *Pride* and *Ward* suits; and because Crispin was not without fault with respect to those injuries, it is not entitled to indemnification.

1.      12 Okla. Stat. § 832.1

The statute at issue is 12 Okla. Stat. § 832.1, which codifies a manufacturer's duty to indemnify a seller in products liability actions.  Specifically: "A manufacturer shall indemnify and hold harmless a seller against loss arising out of a product liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable." Id. § 832.1(A).  The statute "[a]pplies without regard to the manner in which the action is concluded" and "[i]s in addition to any duty to indemnify established by law, contract, or

---

[4] Crispin identifies its losses as: Coy Reece's consulting fee and expenses ($5,836.40); fees, costs and expenses reasonably incurred to defend the *Pride* and *Ward* lawsuits ($459,973.39); amount advanced to Hager Brothers for the invoice Ward never paid ($106,202.70); trucking expenses incurred in transporting Petrotub casing for inspection ($22,015.00); cost for inspection of Petrotub casing ($43,656.10); cost of non-repairable, defective Petrotub casing following inspections ($6,647.81); lost sales on Petrotub casing as a result of Pride and Ward claims ($86,660.76); interest; and fees/costs associated with this action.  It further claims that these losses are recoverable in their entirety under either an indemnity or breach of contract theory.  The basis for that assertion is not clearly stated in its briefs or otherwise apparent.

otherwise." Id. § 832.1(E). A seller is explicitly authorized to recover from the manufacturer its court costs, reasonable expenses, reasonable attorney fees, and "any reasonable damages incurred . . . to enforce [its] right to indemnification" under the statute. Id. § 832.1(G).

Petrotub is correct that this statute did not become effective until November 1, 2004, which was after the failed frac jobs at the Gowdy and Chick Davis wells, the initiation of the *Pride* and *Ward* suits in state court, Crispin's third-party complaints against Petrotub for indemnification, the removal of those suits to federal court, Crispin's incursion of significant costs, expenses and fees, and the settlement of the *Ward* suit. In its reply brief, Crispin asserts that the Court need not decide the issue of the statute's applicability to decide its motion. (Pl.'s Reply at 10.) Crispin's reasoning is that the statute merely codifies a seller's common law right of indemnity against the manufacturer of a defective product and is relevant only on the issue of whether Crispin might recover fees incurred in this action. (Id.) However, in addition, Crispin contends that the statute applies because its right did not accrue until the *Pride* suit, "the last of the underlying cases," settled in June 2005, which was after § 832.1's effective date. (Id.) Because § 832.1 provides for indemnity against *loss*, a seller's cause of action under that statute accrues when the loss is paid (as opposed to an action for indemnity from *liability*, which accrues when the event for which indemnity is due occurs). See Chicago, R.I. & P. R. Co. v. Davila, 1971 OK 125, ¶ 19, 489 P.2d 760, 764 (discussing the two types of indemnity contracts and when a claim under each accrues). Here, the loss Crispin seeks to recover is not the payment of a single judgment or a settlement, see generally 41 Am. Jur. 2d Indemnity § 26 (2005), but numerous fees, expenses, and costs incurred and

9

presumably paid beginning in approximately November 2002 and related to two different suits that involved related products liability claims.   Nevertheless, because under common law Crispin could recover losses incurred in defending those claims before the statute's effective date, the only apparent meaningful effect of the statute's application would be that Crispin might recover its reasonable fees incurred in pursuit of indemnification.[5]   Because § 832.1 would support an indemnity claim based on at least some of the losses suffered by Crispin as a result of the *Pride* and *Ward* suits, the Court holds that Crispin may recover its fees and costs in seeking indemnification (as "reasonable damages") if it prevails on the underlying indemnity claim.   Based on Crispin's representation that § 832.1 otherwise codifies a seller's common law right to indemnity, however, the Court will apply common law rather than § 832.1 to its claim in all other respects.

### 2.   *Seller's Right to Equitable or Quasi-Contractual Indemnification*

As indicated above, Oklahoma recognizes a seller's right to indemnification from a manufacturer in instances where a product defect, attributable solely to the manufacturer or the manufacturing process, causes injury and the seller was no more than "passively" negligent in causing that injury.   See Braden v. Hendricks, 1985 OK 14, ¶¶ 17-20, 695 P.2d 1343, 1351-52 ; Porter v. Norton-Stuart Pontiac-Cadillac of Enid, 1965 OK 18,405 P.2d 109. The right and respective obligations are quasi-contractual or implied in law as opposed to based on a contract, either express or implied.   Booker v. Sears Roebuck & Co., 1989 OK 156,

---

[5]  Crispin asserts that it could recover those fees under 12 Okla. Stat. §§ 936 and 949 even if § 832.1 does not apply.  (Pl.'s Reply at 10.)  The Court has not endeavored to investigate the accuracy of that assertion.

10

¶ 2 & ¶¶ 4-5, 785 P.2d 297, 301-02 (Summers, J., concurring).  Thus, Crispin's right to

indemnification, such as it is, arises by virtue of its relationship with Petrotub and not because

of either party's intent or an agreement between them.

a.     *Proof of Causation*

Petrotub contends that Crispin's right to indemnity will depend on proof that the

defective casing and couplings used in the Gowdy and Chick Davis wells resulted in the frac

jobs on those wells failing.   The Court does not agree.   Claims for loss for which the

manufacturer must indemnify a distributor include reasonable attorney fees and costs incurred

in the seller's defense of a products liability claim.  Booker, 1989 OK 156, ¶¶ 2-4, 785 P.2d

at 298-99; Friend v. Eaton Corp., 1989 OK CIV APP 74, ¶ **6**, 787 P.2d 474, 476-77

(explaining that seller cannot recover as damages fees incurred in defense of allegations of its

own wrongdoing, as opposed to defending products liability claims brought against the seller

simply because of its placement in the distribution chain).   Payment of a judgment or

settlement by the seller is not a prerequisite to the recovery of those fees and costs.  Id.

Furthermore, it is not always necessary that a distributor, as the purported indemnitee,

establish that the product was actually defective or proximately caused the injuries alleged.

In Booker, the case on which Petrotub relies to suggest a contrary rule (Def.'s Resp. at 15),

a retailer and a wholesaler separately sought indemnification from a manufacturer to recover

the attorney fees and costs they incurred in defending a products liability suit in which the

manufacturer was also a defendant.  1989 OK 156, 785 P.2d 297.  On the products liability

claim, the jury returned a defense verdict.  Id. at ¶ 1, 785 P.2d 298 (reporting jury verdict after

11

a trial on a theory of products liability after all charges of negligence against the remaining defendants were dismissed).  A defective product claim against a manufacturer requires proof of three elements:  a defect in the product caused the injury; the defect existed in the product at the time it left the manufacturer's possession and control; and the defect rendered the product "unreasonably dangerous."  <u>Kirkland v. Gen. Motors Corp.</u>, 1974 OK 52, ¶¶ 29-31, 521 P.2d 1353, 1363.  In answer to the question "whether a manufacturer should be required to indemnify [a seller] for attorney fees and costs when the jury verdict specifically found no product defect or negligence on the part of either the manufacturer [or seller]," the Oklahoma Supreme Court concluded that it did, *if* the seller (1) did not take an adverse position to the manufacturer during trial and (2) its defense conferred a "substantial benefit" to the manufacturer.  <u>Booker</u>, 1989 OK 156, ¶ 3, 785 P.2d at 299.  In reaching this decision, the court reconciled a seller's right to indemnity with "the American rule" that parties bear the costs of their own legal expenses (or more aptly, with the recognized equity-based exceptions to that rule).  <u>Id.</u>

Based on <u>Booker</u>, the Court concludes that under Oklahoma law a seller need not prove that the product was defective or actually caused the injuries alleged to recover the loss it suffered in defending a products liability suit if the manufacturer participated in the underlying suit or settlement.[6]  Although there is substantial dispute about what actually caused the frac

---

[6] There is authority for the rule that recovery on an indemnification claim requires proof of the indemnitor's actual liability to an injured party.  This requirement is imposed in  Restatement (Third) of Torts: Apportionment of Liability § 22 (c) (2000), and elsewhere.  However, in that notable authority, the rationale offered is:  "Otherwise, the indemnitor would be deprived of his day in court."  <u>Id.</u>  Reporters note to cmt. c.

jobs to fail (i.e., couplings of lesser than purported strength and hardness or over-threading

By way of fuller explanation, the Court quotes from the following discussion of the rule as applicable when an indemnitee settles the claims against it and then seeks indemnification from another:

> [R]equiring proof of actual liability is the general rule, from which a "potential liability exception" may be made after weighing the policy interests in encouraging settlements against considerations of fairness to putative indemnitors.  Many courts have elaborated on the circumstances under which a potential liability exception should apply.  Generally, proof of actual liability is required where the settling indemnitee does not notify the putative indemnitor of a potential settlement of the underlying litigation, thereby depriving the indemnitor of an opportunity to approve the settlement, participate in the settlement negotiations, or assume the defense of the underlying claim. . . .
>
> When the indemnitee has not given the indemnitor an opportunity to review, pass upon, or participate in the settlement, due process and equity require the indemnitee to demonstrate actual as opposed to potential liability. . . . Thus, "where the party having a duty to indemnify has been notified or been made a party to the underlying proceedings and given an opportunity to participate in its settlement negotiations, courts have concluded that the defendant-indemnitee should not be required to prove the plaintiff's actual ability to recover the amount paid in the settlement. It is sufficient if the defendant-indemnitee proves that he was potentially liable to the plaintiff."
>
> Neither the Tenth Circuit nor the Oklahoma Supreme Court have directly addressed the issue of what notice a settling indemnitee is required to give a putative indemnitor in order to trigger the "potential liability" exception to the general "actual liability" rule for indemnity actions.  The decisions of the Tenth Circuit and Oklahoma Supreme Court which tangentially address the issue are, however, in accordance with the authorities discussed above-that a settling indemnitee need only show potential as opposed to actual liability to the injured party, as long as the putative indemnitor was given adequate notice of the settlement and an opportunity to object and assume defense of the action.

In re: Cooper Mfg. Corp., 131 F. Supp. 2d 1238, 1252-54 (N.D. Okla. 2000) (citations and footnotes omitted).

This case clearly falls outside the situations described above where proof of actual liability is required because Petrotub participated in and paid the settlement of the *Ward* and *Pride* suits, clearly with notice of the claims and having the chance for its "day in court."  Thus, under the circumstances, Crispin is required to show that it was potentially liable and no more.

at the well-sites), there is no dispute that the some of the Petrotub casing installed at those locations did not meet designated API standards.  Thus, even though the *Pride* and *Ward* suits were settled before a determination of proximate cause, Crispin may recover its reasonable fees and costs in defending the products liability claims asserted in those suits–if it did not take an adverse position to Petrotub and its defense conferred a "substantial benefit" to Petrotub.

The record at summary judgment shows that Crispin and Petrotub defended the *Pride* and *Ward* suits pursuant to a joint defense agreement.  Thus, the first requirement of a non-adverse position is satisfied.  However, Petrotub appears to question whether Crispin's defense efforts conferred a substantial benefit upon it or were largely unnecessary and redundant.  The arguments with respect to this issue are not fully developed with specific references to the evidence.  However, it is apparent that a factual dispute exists on that issue that should be resolved at trial.  Therefore, summary judgment on Crispin's indemnity claim is not appropriate for this reason.

### b.    *Crispin's Alleged Negligence*

Petrotub also argues that because Crispin was aware that the Petrotub casing might not meet API standards, it is not without fault and therefore not entitled to indemnification.  As an initial matter, the Court must consider the alleged fault.  To support its argument, Petrotub identifies the e-mails quoted above from André Crispin to Nicholae Soto in October and November 2001.  Construed in the light most favorable to Petrotub, those e-mails suggest that Crispin had received reliable inside information raising serious questions about storage and

14

quality assurance inspection practices.[7]  Crispin does not dispute that it failed to alert Hager Brothers or other customers about the potential that Petrotub casing might not meet API standards.  Although one e-mail refers to possible protective measures Crispin could take to guard against defective or inferior products from Petrotub, the record is silent as to what actions Crispin took, if any.

Under these circumstances, Crispin may have had a duty to alert Hager Brothers to the danger that Petrotub casing did not meet API specifications and/or to have the casing in its possession tested before reselling them.[8]  To the extent that Petrotub contends that the "Terms and Conditions of Sale" in the contracts between Crispin and Hager Brothers imposed a contractual duty of inspection (see Def.'s Ex. 11), the Court does not agree.  Instead, Crispin's duty or duties, if any, arose by nature of its relationships and the particular circumstances.

> Under Oklahoma law, "the existence of a duty depends on the relationship between the parties and the general risks involved in the common undertaking. Whether a defendant stands in such relationship to a plaintiff that the law will impose upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff is a question for the court."

---

[7] Crispin argues that those e-mails do not raise a colorable inference of negligence because of the reference to "pipes" rather than couplings.  (Pl.'s Reply at 5.)  However, the Court finds the evidence sufficient to reasonably support the inference stated above.

[8] Although there is evidence that Crispin received a demand letter from Pride before Ward's frac job on the Chick Davis well, see, e.g., Restatement (Third) of Torts: Product Liability § 10 (1998 ) (identifying liability for post-sale failure to warn), the Court has limited its consideration of Crispin's possible negligence to Petrotub's argument, which is based on the Crispin/Soto e-mails.

Woolard v. JLG Indus., Inc., 210 F.3d 1158, 1170 (10th Cir. 2000) (quoting Wofford v. E.

State Hosp., 1990 OK 77, ¶ 10, 795 P.2d 516, 519) (internal citation and quotation marks

omitted.) Under the Restatement (Second) of Torts:

> A seller of a chattel manufactured by a third person who knows or has reason to know that the chattel is, or is likely to be, dangerous when used by a person to whom it is delivered or for whose use it is supplied, or to others whom the seller should expect to share in or be endangered by its use, is subject to liability for bodily harm caused thereby to them if he fails to exercise reasonable care to inform them of the danger or otherwise to protect them against it.

Restatement (Second) of Torts § 401 (1965); see also Duane v. Okla. Gas & Elec. Co., 1992

OK 97, ¶ 4, 833 P.2d 284, 286 (applying Restatement (Second) of Torts § 388 regarding

supplier's liability for failing to warn of chattel known to be dangerous for its intended use).

In addition, although a seller generally does not have a duty to inspect products, such a duty

may arise if it knows or has reason to know that the product is or is likely to be dangerous.

Restatement (Second) of Torts § 402 (1965); Burgess v. Montgomery Ward & Co., 264 F.2d

495, 498 (10th Cir. 1959) (noting that decisions generally support this rule).  Oklahoma has

specifically recognized:

> Where a vendor supplies a purchaser with a device or instrumentality, and in exercise of ordinary care knows or should know if same is defective it will be dangerous to all who come in contact therewith during use for the purpose for which intended, the vendor owes a duty to ascertain the condition of the instrumentality by exercising reasonable care to see that it is safe for the use for which intended.  A vendor who fails to exercise ordinary care to ascertain the true condition and safety of the instrumentality, and chooses to sell without notice or warning of the dangerous characteristics and dangers inherent in use thereof is liable for injuries proximately caused by use of the instrumentality.

<u>Bower v. Corbell</u>, 1965 OK 163, ¶ 32, 408 P.2d 307, 315-16.  For purposes of this motion and in construing the evidence in Petrotub's favor, the failure of Petrotub's casing (joints and/or couplings) to meet API specifications will be treated as a defect that, given the intended use of the casing, was dangerous.  Thus, the factfinder will have to consider the nature of the information received as well as Petrotub's reputation (in addition to other facts that might be relevant) to determine whether Crispin acted reasonably under the circumstances.

The next question is whether, even if Crispin breached a duty to warn and/or inspect, its conduct was of such a legally insignificant character that it is entitled to indemnification as a matter of law.  "Oklahoma courts have repeatedly held that a party whose negligence has proximately caused the injuries in question may not seek equitable indemnification from a third party who has also proximately caused those injuries."  <u>Woolard</u>, 210 F.3d at 1178.  Because a seller of a defective product is strictly liable for the injuries caused, the seller who seeks indemnification from the manufacturer is often only vicariously or constructively liable.  See <u>Braden</u>, 1985 OK 14, ¶ 18, 695 P.2d at 1351; <u>Travelers Ins. Co. v. L.V. French Truck Serv., Inc.</u>, 1988 OK 76, ¶ 8 n.16, 770 P.2d 551, 555 n.16 ("Noncontractual or equitable indemnity is similar to common-law contribution; one who is only constructively or vicariously obligated to pay damages because of another's tortious conduct may recover the sum paid from the tortfeasor.")  Such an "innocent" seller satisfies the indemnification requirement of being "without fault," <u>National Union Fire Insurance Co. v. A.A.R. Western Skyways, Inc.</u>, 1989 OK 157, ¶ 7, 784 P.2d 52, 54,  or "in no manner responsible for the harm," <u>Braden</u>, 1985 OK 14, ¶ 11, 695 P.2d at 1349.  However, a seller who is partially at

fault, even if to a significantly lesser extent than the manufacturer, has no right to indemnity. Woolard, 210 F.3d at 1179-80 (noting persuasive authority to the contrary).  A seller's loss of innocence is, thus, a loss of indemnification.  An exception to this indemnity bar exists in situations where the seller's negligence is not the proximate cause (in the sense of being the "efficient" and "sole" cause) of injury, is based a "passive" fault, or is based on the breach if a legal duty that merely furnishes a condition by which the injury was possible.  Porter, 1965 OK 18, ¶ ¶ 14-24, 405 P.2d 109, 113-15; see also Wathor v. Mut. Assurance Adm'rs, Inc., 2004 OK 2, ¶ 15, 87 P.3d 559, 571 ("The remedy of indemnity is appropriate where one party has a primary or greater liability or duty which requires him to bear the whole of the burden as between the parties.")

The passive-active negligence distinction was adopted in Oklahoma's seminal indemnification case, Porter v. Norton-Stuart Pontiac-Cadillac of Enid, 1965 OK 18, 405 P.2d 109.  Rucker Co. v. M. & P Drilling Co., 1982 OK 131, ¶ 6, 653 P.2d 1239, 1241; Wathor, 2004 OK 2, ¶ 15, 87 P.3d 559, 570-71.

> *Porter* involved an indemnity suit between a car dealership and an instrument manufacturer for the injury to the dealership's customer. While an employee of the instrument manufacturer was working on a car, the car lurched forward and ran over the customer. The customer sued the dealership and the manufacturer for negligence. The Court recognized that regardless of whether the dealership failed to maintain a safe premises or failed to warn the customer [as its invitee], the sole cause of the injury was the act of the manufacturer's employee moving the gear selector from neutral to drive. . . .  [T]he dealership's negligence, if any, was so far removed from the causal nexus between its negligence and the instrument manufacturer's negligence, that the Court held that it merely furnished a condition by which the injury was possible and a subsequent act caused the injury.

Johnson v. Hillcrest Health Center, Inc., 2003 OK 16, ¶ 22 n. 31, 70 P.3d 811, 820 n.31.

Although Porter involved a failure to warn, the evidence presented in this case is sufficiently distinguishable to preclude summary judgment in Crispin's favor. Construed in the light most favorable to Petrotub, the e-mails to Soto indicate that Crispin had credible information that some of the Petrotub casing might not meet API standards, notwithstanding their accompanying mill certificates. Such products would be defective and, given their intended use, dangerous. Because this information appears to have alerted Crispin to a specific risk, which may have given rise to a duty to warn and/or inspect, the Court cannot conclude as a matter of law that in failing to act Crispin's role in causing the injuries alleged[9] was only passive.[10] Instead, because a jury could find that Crispin's negligence in failing to

---

[9] Petrotub identifies numerous expert opinions that the well failures were not caused by defective couplings but by over-threading. Proof that product defects were *not* the cause of those injuries would not defeat Crispin's right to indemnification, as explained above, but would effectively undermine Petrotub's defense that Crispin was also at fault.

[10]      The most common example of active/passive negligence in products liability is that of a retailer's failure to inspect a product for defect that leads to liability for that defective product and the retailer seeks indemnity from the manufacturer. It has been held that a retailer's failure to inspect a product for defects may constitute passive negligence, entitling him to indemnification from the manufacturer whose negligence was responsible for the defect, although other courts have held that such failure constitutes active negligence, reasoning that to hold otherwise would place a premium upon distributor ignorance. Where there is actual knowledge of a defect, and a subsequent failure to correct it or warn against it, the retailer will be denied indemnification. Thus, "active" negligence is not limited to positive conduct; inaction may also constitute active negligence.

2 David G. Owen et al., Madden and Owen on Products Liability § 25:3 (May 2006) (footnotes omitted).

warn Hager Brothers and/or inspect the Petrotub casing was a cause or contributing factor in failed frac jobs, summary judgment is inappropriate.  See American Law of Products Liability § 52:88 (3d ed. Aug. 2006) (noting that the distinction between active and passive negligence is ordinarily for the factfinder).

A recent Tenth Circuit case illustrates the rule that negligence in failing to act may preclude indemnification vis-à-vis an even more culpable entity.  In Woolard v. JLG Industries, the plaintiff was injured when an aerial work platform he was working on collapsed.  210 F.3d 1158.  The plaintiff asserted negligence claims against the platform owner for failing to maintain, inspect, and provide safe and reliable equipment and for failing to perform manufacturer-required inspections.  Id. at 1163-64.  The plaintiff also asserted negligence claims against the platform distributor, who repaired the platform with substandard sheave pins, which contributed to the collapse of the boom holding the lift basket in which the plaintiff was riding, for failing to maintain and repair the platform, failing to discover the worn pin and perform inspections, and failing to notify the owner, the plaintiff's employer, and the plaintiff of the need for inspections.  Id.  On appeal following a jury trial, the circuit held that the owner was barred under Oklahoma law from recovering from the distributer, as the source of the defective product, on a claim of equitable indemnity because the jury found that the owner was the proximate cause of forty percent of the plaintiff's injuries.  Id. at 1179-80.

Thus, for the reasons detailed above, Crispin's motion for summary judgment on its indemnity claim is denied.

20

B.       *Breach of Contract*

Crispin also claims that it may recover damages under a breach of contract theory. Petrotub contends that Crispin is not entitled to breach of contract damages because: it accepted products with a known defect; it failed to notify Hager Brothers, Ward, or Pride of quality issues and thus did not minimize its damages; and the damages claimed were not the direct result of Petrotub's breach.

The elements of a breach of contract claim are:  (1) the formation of a contract; (2) breach of the contract; and (3) damages as a direct result of the breach.  <u>Digital Design Group, Inc. v. Info. Builders, Inc.</u>, 2001 OK 21, ¶ 33, 24 P.3d 834, 843.  Here, it is undisputed that Crispin purchased Petrotub casing pursuant to written purchase contracts.  Thus, the Court finds, in satisfaction of the first element of Crispin's breach of contract claim, that there was a contract for the sale of goods.  In addition, it is undisputed that Petrotub expressly warranted, <u>see</u> 12A Okla. Stat. § 2-313, that the casing and couplings  met the casing-strength properties for the 5CT API specification (Pl.'s Mot. at 20; Def.'s Resp. at 24) and that some did not meet that specification.  The failure of some casing and couplings to meet API standards (because that was contrary to the obligations under the contracts) rendered them non-conforming.  <u>See</u> 12A Okla. Stat.§ 2-106(2).

1.       *Effect of Voluntary Acceptance of Non-Conforming Goods*

Petrotub contends, based on e-mails to Soto showing that Crispin was concerned about Petrotub's storage and inspection of "pipe," that Crispin knowingly accepted defective or non-conforming goods and, therefore, Crispin cannot now complain that Petrotub breached its

21

express warranty that the goods were of a specific API grade.  (Def.'s Resp. at 19 n.3.)  The Court does not agree.

There is no dispute that Crispin accepted casing from Petrotub.  <u>See</u> 12A Okla. Stat. § 2-606.  Crispin apparently has since sold or salvaged that casing.  However, even construed in the light most favorable to Petrotub, the evidence shows that as of October 2001, Crispin was aware of a specific risk that Petrotub casing might not conform to contract specifications.  That evidence does not support the inference that Crispin knew for certain that any or all Petrotub casing was nonconforming.  Thus, Petrotub has not shown that Crispin's acceptance was with knowledge of a nonconformity.

Moreover, even if Crispin knowingly or voluntarily accepted nonconforming goods, it is not precluded from bringing a suit for damages based on breach of warranty.  12A Okla. Stat. § 2-607(2) states, in pertinent part, that "acceptance [of goods with knowledge of a nonconformity] does not of itself impair any other remedy provided by this article for nonconformity."  Under § 2-714, a buyer who has accepted goods and given notice "may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."  <u>Id.</u> § 2-714(1).[11]  Damages for breach of warranty are "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different

---

[11]  Petrotub does not oppose Crispin's breach of contract claim on the ground that Crispin unreasonably delayed in giving notice or rendered deficient notice under 12A Okla. Stat. § 2-607(3).

amount" and may include incidental and consequential damages under § 2-715. Id. § 2-714(2) & (3); see also Atlan Indus., Inc. v. O.E.M., Inc., 555 F. Supp. 184 (W.D. Okla. 1983).  Thus, even knowing acceptance does not preclude an action for breach.

### 2.      *Failure to Minimize or Mitigate Damages*

Petrotub also contends that Crispin did not minimize its damages.  (See Def.'s Resp. at 24 ("Crispin compounded any quality issues in the Petrotub casing by failing to notify Hager Brothers, Ward and Pride that the casing may not conform with API specifications and that it failed to inspect the casing.").)  A buyer's failure to minimize or mitigate damages may impact its recovery of incidental and consequential damages. Catlin Aviation Co. v. Equilease Corp., 1981 OK 13, ¶ 19, 626 P.2d 857, 861; 12A Okla. Stat. § 2-715.  However, as discussed more throughly above, there are issues of fact in dispute with respect to what Crispin knew and what would have been a reasonable response under the circumstances.  Thus, it is not appropriate to award such damages at summary judgment.

### 3.      *Direct Cause*

Finally, Petrotub complains that there are material issues of fact in dispute as to the proximate cause of Crispin's damages.  (Def.'s Resp. at 25.)  Petrotub cites expert opinions identifying the cause of the failure of the frac jobs at the Gowdy and Chick Davis wells as support.  However, Crispin's breach of contract claim is premised on a breach of warranty theory and the nonconformity of tender.  Thus, by statute, it is entitled to general or direct damages upon proof that nonconformity of tender caused a loss that resulted "in the ordinary course of events from the seller's breach." 12A Okla. Stat. § 2-714(1).  Damages flowing in

the ordinary course from Petrotub's breach of its express warranty do not depend on proof of a proximate cause of the casing string failures at the wells.  Nor will Crispin's entitlement to incidental damages, defined as reasonable expenses incident to the breach, id. § 2-715(1), or *all* of the claimed consequential damages, cf. id. § 2-715(2), require such proof.

In conclusion, the Court holds that Crispin is entitled to summary judgment on its breach of contract claim as a matter of law.  The undisputed evidence shows that Crispin and Petrotub entered into contracts for the sale of goods, Petrotub expressly warranted that those goods would meet API specifications for P110 steel, some of the casing accepted failed to conform to that standard, and Crispin suffered injury or damage as a result.  However, it is impossible due to the state of the record and outstanding factual disputes to accurately measure Crispin's damages.

## CONCLUSION

Accordingly, The Crispin Company's Motion for Summary Judgment (Dkt. No. 19) is GRANTED in part and DENIED in part.  Crispin is entitled to judgment on Petrotub's breach of contract as a matter of law with the measure of those damages to be determined at trial.  Issues of fact preclude a determination as a matter of law on Crispin's equitable indemnity claim.  A judgment will issue at the conclusion of these proceedings.

IT IS SO ORDERED this 28th day of September, 2006.

ROBIN J. CAUTHRON
United States District Judge